IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE, KNOXVILLE DIVISION

| | | |
|---|---|---|
| PHYLLIS G. BARNES, and<br>WALTER R. BARNES | )<br>)<br>) | |
| Plaintiffs, | )<br>) | |
| v. | )<br>) | Civil Action No. 3:15-cv-556 |
| GREG MALINAK, DEBBIE MALINAK,<br>and SIDNEY JAMES MOTOR LODGE,<br>INC. d/b/a OLDE GATLINBURG RENTALS | )<br>)<br>)<br>)<br>) | **JURY DEMAND** |
| Defendants. | ) | |

### DEFENDANTS GREG MALINAK AND DEBBIE MALINAK'S MOTION TO EXCLUDE THE TESTIMONY OF RUSSELL KENDZIOR AS AN EXPERT AT TRIAL

Come now the Defendants, Greg Malinak and Debbie Malinak (collectively sometimes referred to hereafter as "Defendants" or "the Malinaks"), by and through counsel, and hereby move this Honorable Court to exclude the testimony of Russell Kendzior because admission of his testimony would be contrary to law and the Federal Rules of Evidence relevant to the admission of expert testimony. Fed. R. Evid. 702; *Daubert v. Merill-Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). In support of this motion, Defendants state as follows:

### FACTS

Plaintiffs brought this action to recover for injuries Plaintiff Phyllis G. Barnes allegedly sustained on April 10, 2015, when she fell in a bathroom at a rental condominium owned by the Malinaks in Gatlinburg, Tennessee. *See* Complaint, [Doc. 1]. Defendant Sidney James Motor Lodge, Inc. d/b/a Olde Gatlinburg Rentals ("Gatlinburg Rentals") manages and maintains the condominium for the Malinaks. *See* Complaint, [Doc. 1]. On the morning of the fall, Plaintiff

Phyllis Barnes went into the bathroom of the condominium in question, laid the cotton bathmat provided by Gatlinburg Rentals on the bathroom floor in front of the bathtub, and took a shower. *See* Complaint, [Doc. 1]. When she stepped out of the bathtub onto the bathmat, she fell. *See* Complaint, [Doc. 1].

On March 31, 2017, Plaintiffs produced a Rule 26(a)(2) Expert Disclosure and Report of Russell Kendzior ("Original Report"). *See* Original Report, attached hereto as **Exhibit A**. According to Mr. Kendzior's curriculum vitae, which is attached as Exhibit A to the Original Report, he has a Bachelor of Science in mathematics from Bradley University with no other advanced education or any training as an engineer, physicist, or architect. In the Original Report, Mr. Kendzior purports to opine that the Malinaks "breached the standard of care they owed to the Plaintiffs to provide them a bathmat that would not slip when used for exiting the bathtub." *See* Original Report, p. 2. Mr. Kendzior opined that the Malinaks failed to provide a suitable bathmat for the type of flooring that was in the condominium yet he had never seen or tested the flooring and, at the time of the Original Report, had not seen or tested the bathmat either. *See id.*; Deposition of Russell J. Kendzior ("Kendzior Depo."), 48, 58, 156-57, attached hereto in relevant part as **Exhibit B**. Mr. Kendzior attempted to define the difference between a bath mat and a bath towel, referring to the mat in question as a towel because it did not have an absorbent top surface with slip resistant backing, but he gives no reference for any such definition. *See* Original Report, p. 2; Kendzior Depo., 21, 59. Mr. Kendzior then broadly opined that the bathmat's "design, construction, and lack of a slip resistant backing were insufficient to prevent the towel from slipping on the smooth surfaced floor," again without having ever seen or testing the mat or the floor. *See* Original Report, p. 2; Kendzior Depo., 48, 58, 156-57. Mr. Kendzior further opined that the Malinaks breached the standard of care they owed the Plaintiffs by failing

to warn them of the risk of falling due to the slipperiness of the surface of the floor when combined with the use of the towel. Original Report, p. 2.

The Original Report provided that Mr. Kendzior considered "1) Deposition transcripts of the Phyllis Barnes and Walter Barnes; 2) photographs of the bath mat towel; 3) Complaint; 4) discovery responses of Defendants; 5) Review and application of nationally recognized safety codes and standards including: 'The American National Standards Institute (ANSI) A1264.2-2012 'Provision of Slip Resistance on Walkway/Working Surfaces,' The National Floor Safety Institute (NFSI) 101-C 'Test Method for Measuring Dry TCOF of Floor Mat Backing Materials' and The American Society of Testing and Materials (ASTM) F-1637-10 'Standard Practice for Safe Walking Surfaces.'" *See* Original Report, p. 3.

Mr. Kendzior received the exemplar bath mat on May 2, 2017, but he never visited the condominium in question or saw the floor involved in the fall. *See* Kendzior Depo., 48, 58. On May 15, 2017, Plaintiff provided a supplemental report from Mr. Kendzior ("Supplemental Report"). *See* Supplemental Report, attached hereto as **Exhibit C**. In issuing his Supplemental Report, Mr. Kendzior reviewed Plaintiffs' Amended Complaint, Plaintiffs' deposition testimony, Defendants' "Injury to Guest/Accident Form," photographs of the bathroom involved, and the exemplar bath mat. *See* Supplemental Report, p. 1. Mr. Kendzior observed that the flooring material in the relevant bathroom was "that of a smooth and lightly colored 12" X 12" tile." *Id*. When asked how Mr. Kendzior obtained the measurements from his report that stated the flooring was a "smooth and lightly colored 12" X 12" tile," Mr. Kendzior stated that it was "kind of an estimate" from looking at the photographs. Kendzior Depo., 92-93.

In the Supplemental Report, Mr. Kendzior opined that the bath mat in question was more appropriately a "bath towel," again giving no basis for such definition. *See* Supplemental

Report, p. 2. Mr. Kendzior stated that he used the National Floor Safety Institute ("NFSI") 101-C standard, a test method for measuring dry transitional coefficient of friction ("TCOF") of floor mat backing materials, to determine the slip resistance of the bath mat. *Id.* Ironically, Mr. Kendzior founded the NFSI in 1997 and still serves as its Board of Directors Chairman. *See* Kendzior Depo., 19. Mr. Kendzior explained that mat backings having TCOF equal to or greater than a value of 0.5 are considered high-traction per the NFSI 101-C standard, but mat backings with a lower value are considered low traction. *See* Supplemental Report at p. 3.

Mr. Kendzior stated that he tested the exemplar bathmat pursuant to the NFSI 101-C test method and determined that the dry mat had a TCOF value of 0.14, which is below the "required" minimum value of 0.5 needed for a high-traction mat. *See* Supplemental Report, p. 3. Mr. Kendzior opined that the low level of slip resistance or traction would increase the likelihood of sliding on a "smooth surface floor" like that in the condominium in question, which he had never seen. *Id.* Mr. Kendzior concluded that the bathmat was "inappropriate for use on smooth surface floors like that as located in the Defendants' guest room." *Id.* He opined that the bathmat "did not have the *required* level of slip resistance and therefore would be inappropriate for use as a bathmat" but admitted in his deposition that the standards he used were *voluntary* and not required by any code, ordinance, or law. *See* Supplemental Report, p. 3 (emphasis added); Kendzior Depo., 52-53, 72, 80, 95, 101, 126.

Mr. Kendzior also cited the American Society of Testing and Materials ("ASTM"), F-1637-09 standard in his Supplemental Report to conclude that the bathmat was not in compliance with this "nationally recognized industry standard" because it was not "affixed to the floor nor did it have a slip resistant backing." *Id.* However, in his deposition, Mr. Kendzior testified that fixation of a bath mat was not necessary to comply with the standard of care. *See* Kendzior

Depo., 143. This "nationally recognized industry standard" is also voluntary according to Mr. Kendzior's testimony and under its own terms. Kendzior Depo., 80. Mr. Kendzior stated that the bathmat failed to provide a "safe, slip resistant, secure means of exiting the shower and/or traversing the slippery tiled floor" that he had never seen. *See* Supplemental Report, p.In conclusion, Mr. Kendzior opined, without ever seeing the flooring surface at issue, that the failure to provide "a suitable, slip resistant bathroom flooring surface presented an unreasonably dangerous condition" to anyone exiting the bathtub. *See* Supplemental Report, p. 4.

## LAW AND ANALYSIS

With few exceptions, all relevant evidence is admissible, but evidence which is irrelevant is not admissible. Fed. R. Evid. 402. Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusing the issues, or misleading the jury. Fed. R. Evid. 403. "In general, the court must decide any preliminary question about whether a witness is qualified[.]" Fed .R. Evid. 104(a). Federal Evidence Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> **(b)** the testimony is based on sufficient facts or data;
> **(c)** the testimony is the product of reliable principles and methods; and
> **(d)** the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

A district court's task in assessing evidence proffered under Rule 702 is to determine whether the evidence "both rests on a reliable foundation and is relevant to the task at hand." *Id*. at 597. The district court must consider "whether the reasoning or methodology underlying the testimony is scientifically valid." *Id.* at 592-93. There is no "definitive checklist or test," but the

United States Supreme Court in *Daubert* set forth a number of factors for the inquiry. *Daubert*, 509 U.S. at 593-94. These factors include:

> (1) whether a "theory or technique ... can be (and has been) tested"; (2) whether the theory "has been subjected to peer review and publication"; (3) whether, with respect to a particular technique, there is a high "known or potential rate of error" and whether there are "standards controlling the technique's operation"; and (4) whether the theory or technique enjoys "general acceptance" within a "relevant scientific community."

*Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 429 (6th Cir. 2007) (citing *Daubert*, 509 U.S. at 592-94). The Rule 702 inquiry is "a flexible one," and the "focus . . . must be solely on principles and methodology, not on the conclusions they generate." *Daubert*, 509 U.S. at 594-95.

"The trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. Trial judges have the responsibility of acting as gatekeepers to exclude unreliable expert testimony. *Daubert*, 509 U.S. 579; *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528 (6th Cir. 2008). The task for the district court in deciding whether an expert's opinion is reliable is "to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *Id.* at 529-30.

**I.      Russell J. Kendzior is not qualified to issue the opinions contained in his report or to testify regarding the conclusions he purports to have reached in this case.**

Mr. Kendzior's qualifications are insufficient to support his opinions and conclusions. *See* Exhibit A to Original Report. He is a mathematician, not an engineer or architect, and he is not an expert who possesses the knowledge, skill, experience, training or education or the scientific, technical or other specialized knowledge necessary to conclude that any act or omission of the Malinaks caused the fall or alleged damages sustained by Plaintiffs. *Id.* Mr. Kendzior maintains a bachelor's degree in mathematics from Bradley University with no further

scientific or engineering qualifications. *Id*. He has no post-graduate degree and is not a licensed engineer nor a licensed architect. *See* Kendzior Depo., 6. Mr. Kendzior does not have any training in terry cloth bath towels or their use as bath mats. Kendzior Depo., 6-11. The NFSI, on whose standards and testing methods Mr. Kendzior almost exclusively relies, was founded by Mr. Kendzior, and he still serves as the Chairman of its Board of Directors. *See* Exhibit A to the Original Report; Kendzior Depo., 19. Testifying in hundreds of cases regarding slip and falls alone does not produce an expert. *See* Kendzior Depo., 29-30. None of Russell Kendzior's credentials are related to a scientific background that could relate to the facts of this case or assist the trier of fact in determining the issues in this case. *Id.*

**II. The opinions and conclusions of Mr. Kendzior lack sufficient factual basis or scientific reliability to be admissible under the Federal Rules of Evidence or *Daubert*.**

The Court must exclude unreliable testimony, and the admission of expert testimony is governed by Rule 702 and *Daubert*. The opinions expressed in Mr. Kendzior's reports do not satisfy the standards for expert testimony established by *Daubert* and Rule 702. "Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 137, 118 S. Ct. 512, 515, 139 L. Ed. 2d 508 (1997). Mr. Kendzior asserts many opinions regarding safety requirements and standards of care without reference to any scientific evidence or applicable standard, determining that the bath mat was unsafe on the flooring basically because he said so.

Mr. Kendzior's opinions that the floor is "slippery," that the bath mat was inappropriate for the type of flooring in the bathroom, or that the mat slipped because of the type of flooring are unreliable and irrelevant because Mr. Kendzior has not seen, examined, inspected, or tested the flooring. He has never been to the condominium where Plaintiff Phyllis Barnes fell in

Gatlinburg, Tennessee. *See* Kendzior Depo., 48. He never even sent anyone to the condominium on his behalf to perform any testing or examine the scene. *See* Kendzior Depo., 48. At the time that Mr. Kendzior issued his first report, the report relied upon by the Plaintiffs in responding to the Defendants' Motions for Summary Judgment, he did not even have an exemplar bathmat in his possession but relied on photographs and assumptions for his opinions. *See* Kendzior Depo., 156-157.

Mr. Kendzior had insufficient facts to reach the conclusions he asserts. Mr. Kendzior's Original Report states that the Defendants failed to provide a suitable bathmat for the type of flooring that was in the condominium, but Mr. Kendzior had never seen the flooring in the condominium or tested the bathmat in question against that flooring. *See* Original Report, p. 2; Kendzior Depo., 48, 58, 156-57. Mr. Kendzior relied on photographs and Plaintiff Phyllis Barnes' testimony to determine the flooring type. *See* Kendzior Depo., 58-59. Mr. Kendzior never spoke to the Plaintiffs about any of the issues in this case nor has he spoken with or corresponded with any of the Defendants in this case. *See* Kendzior Depo., 47. He reviewed the Plaintiffs' depositions but no testimony from the Defendants or their experts. He did not review any of the Defendants' Answers, either party's Initial Disclosures, or the Plaintiffs' discovery responses. *See* Original Report, p. 3; Supplemental Report, p. 1.

In both reports, Mr. Kendzior made broad conclusions about the Malinaks breaching certain standards of care they owed Plaintiffs, citing ANSI, ASTM, and NFSI standards to establish a standard of care However, when asked what codes, laws, standards, or ordinances, if any, supported his contention that the Defendants breached the standard of care, Mr. Kendzior conceded that the standards and codes he cited were all voluntary and not mandated by any law

in Gatlinburg, Sevier County, or the State of Tennessee. Kendzior Depo., 52-53, 72, 80, 95, 101, 126.

ASTM standard F-1637-10 cited by Mr. Kendzior states that it is intended to "provide reasonably safe walking surfaces for pedestrians wearing ordinary footwear." *See* Kendzior Depo., 82. Somehow, Mr. Kendzior believes that this standard is applicable in a bathroom and to a Plaintiff who is not wearing any footwear. *See* Kendzior Depo., 83. He testified, "Well, this is a towel that's used in the bathroom where people may come into the bathroom after they're showered and step on it with a shoe or footwear. It's not specific. . . . So the product itself, the towel, has to sustain a level of safety with shoes and, in the case of Ms. Barnes, without shoes." *See* Kendzior Depo., 83. No reasonable jury could conclude that a standard that specifically states it applies to pedestrians wearing normal footwear would apply in a bathroom to a guest wearing no shoes.

In another stretch of application, Mr. Kendzior cites ANSI standard A1264.2. This standard states that it applies "primarily to the protection of employees in workplace situations. It does not apply to construction, residential occupancies, floating roof tanks or marine dock facilities." *See* Kendzior Depo., 161. Again, Mr. Kendzior somehow believes this standard is applicable in a short term rental's bathroom, stating "some housekeeper, a worker is going to be coming into this bathroom. . . . It's a work area for them. They're cleaning it." The Plaintiffs were not employees of the Defendants. No reasonable jury could determine that this standard was applicable under the facts of this case.

Mr. Kendzior has issued certain opinions in his Supplemental Report regarding the lack of grab bars in the bathtub in question. The lack of grab bars is not an issue in this case because it was not addressed in the Complaint or Amended Complaint and because the Plaintiffs have

never asserted that the fall was because of the lack of a grab bar. If Mr. Kendzior's testimony is not excluded in total, a Motion in Limine will follow relevant to this testimony. Nonetheless, Mr. Kendzior opines that a the Malinaks should have provided a grab bar at the front critical support service wall of the bathtub/shower enclosure as required by the ASTM standard F-446-99 and the Americans with Disabilities Act ("ADA"). *See* Kendzior Depo., 94-95. Again, Mr. Kendzior conceded that the ASTM standard was a completely voluntary standard that was not legally applicable to the condominium in question. *See* Kendzior Depo., 95. He also conceded that Plaintiff Phyllis Barnes was not protected by the ADA because she was not disabled and that that ADA did not apply to her. *See* Kendzior Depo., 95-96.

Mr. Kendzior left pivotal facts unconfirmed and attempted to apply standards that are simply not relevant to the facts of this case. He made broad conclusions that the Malinaks breached the standard of care owed to the Plaintiffs under a standard that simply does not exist. His opinions are not relevant or reliable.

**III.     The reasoning and methodology underlying Mr. Kendzior's conclusions are not scientifically valid and not based in science.**

In determining "whether the reasoning or methodology underlying the testimony is scientifically valid," the Court should consider the factors discussed in *Daubert*, 509 U.S. at 593-94. Mr. Kendzior's opinions are not based in any science but instead depend on the trier of fact believing his opinions are true because he said so. He attempts to support his opinions by performing a test governed by a standard that was written by him, are voluntary, and are not applicable to the facts of this case.

**A.    Mr. Kendzior's techniques or theories have not been tested and have not been objectively challenged.**

The NFSI 101-C standard used to test the bath mat in this case was a standard that was created by and for the NFSI, approved and codified by the NFSI Board of Directors, and published as an NFSI standard, which is voluntary.  *See* Kendzior Depo., 126.  When asked if NFSI 101-C, the testing procedure, was ever subjected to peer review, Mr. Kendzior testified that the NFSI developed private standards that were voluntary for an industry to either adopt or not. *See* Kendzior Depo., 125.  In fact, Mr. Kendzior founded the NFSI, serves as chairman of its board of directors, and actually wrote the standard he claims to have used to test the bath mat. *See* Kendzior Depo., 74-75.  NFSI standard, section 1.3 actually states that "No express or implied representation or warranty is made regarding accuracy or significance of any test results in terms of slip resistance."  S*ee* Kendzior Depo., 75.  Moreover, none of Mr. Kendzior's publications have been peer-reviewed.  *See* Kendzior Depo., 33.

**B.    The rate of error, calculated only by Russell Kendzior, and the standard operation of testing, known and supported only by Mr. Kendzior, does not indicate reliability.**

Mr. Kendzior did one test using an unreliable machine to put a figure on the transitional coefficient of friction of the bath mat.  Mr. Kendzior used a Brungraber Mark II test device, which is an articulated strut tribometer that can change the angle at which it impacts a floor, to measure the coefficient of friction of the bath mat.  *See* Kendzior Depo., 89.  The tribometer itself is a floor tester, but Mr. Kendzior used it as a floor mat backing sensor device.  *See* Kendzior Depo., 129-130.  The device has a five-pound weight that comes down at a designated angle and transfers weight throughout a 3" x 3" metal plate.  *See* Kendzior depo., 90.  Mr. Kendzior taped a 3" x 3" section cut from the exemplar bath mat to this device to test it.  *See id*.

The tribometer has a tile plate to test the coefficient of friction, and even Mr. Kendzior agrees that the floors in the condominium at question were not tile but were vinyl or linoleum. *See* Kendzior Depo., 91. Mr. Kendzior explained that he used "a representative average type of floor material" for the test. *See* Kendzior Depo., 91-92. He did not know what the coefficient friction of the tile was in this particular bathroom but "assumed" it would be comparable to an average surface. *See* Kendzior Depo., 92. Mr. Kendzior agreed that the floor surface would have some impact on how slip resistant the bathmat was. *See* Kendzior Depo., 114.

Mr. Kendzior testified that the bathmat tested at 0.14, which means that the towel moved at a steep angle such as walking across it. Kendzior Depo., 90. However, Mr. Kendzior does not know the angle that Plaintiff Phyllis Barnes stepped out of the tub onto the towel. *See* Kendzior Depo., 91. Moreover, Mr. Kendzior explained "you can go out and use a Brungraber test device on a floor and come up with a number. And when asked, well, what does the number mean, the answer is we don't know because there is no standard, no method, nothing. It's just a pardon the phrase -- - a gadget." *See* Kendzior Depo., 99-100. Somehow, Mr. Kendzior still believes that the Brungraber device, when used to measure floor mat backings, had credibility because there is a published and reviewed standard specifying how to use the device and to find output values but does not refer to the published standard in his report or deposition. *See* Kendzior Depo., 100. This test and the unknown meaning of its values will surely confuse the issues and mislead the jury.

Mr. Kendzior did not know the date that the Brungraber Mark II device he used to test the towel in this matter was last calibrated by the manufacturer but knew it has been several years. *See* Kendzior Depo., 99. Mr. Kendzior testified that there are approximately 70 different ways to measure surface friction and that there would be different outputs from the different devices. *See*

Kendzior Depo., 99. He testified that most of the devices have no real test method to support their use. *See* Kendzior Depo., 99. Mr. Kendzior testified that the tribometer he used has a 5 percent error rate the way he used it. *See* Kendzior Depo., 134. Mr. Kendzior knew the error rate of the machine only because he calculated it himself based on the fact that some factors are not exactly perfect. *See* Kendzior Depo., 134-35. Mr. Kendzior testified that most tribometers have deviations greater than 5 percent. *See* Kendzior Depo., 136.

The Brungraber Mark II devices are now owned, sold, and distributed by Slip-Test Walkway Tribometers. *See* Kendzior Depo., 132. Relevant here, the "Frequently Asked Question" section of the Slip-Test website provides the following:

> The NFSI floormat testing standard 101-C, referenced in the NFSI floormat "high-traction" certification process in NFSI B101.6, specifies the use of the Mark II or Mark III tribometer. What is the relationship between Slip-Test and NFSI in terms of this NFSI standard?
>
> The Mark II and Mark III (and Mark IIB / Mark IIIB) tribometer designs require a fairly stiff testfoot material, above approximately Shore 35A durometer. The tribometer will not work correctly with softer rubber substrates and foam substrates below Shore 35A that are used on floormats. It would be necessary to basically disable the normal functionality of the Mark II / III / IIB / IIIB when testing such softer materials - measurements will not be reliable. Slip-Test has had no relationship with NFSI and cannot comment on the methodology or reliability of their floormat certification process.

*See* "Frequently Asked Questions." Slip- Test Walkway Tribometers, http://www.slip-test.com/refs_faq.html, a print copy of which is attached hereto as **Exhibit D**. Mr. Kendzior would have had to "basically disable the normal functionality" of the device he used in the relevant test to obtain the result he relies upon, which further proves the unreliability of the test.

The number of assumptions made to perform the test, the fact the machine was not used for its intended purpose, the lack of any recent calibration, and the fact that the only known rate

of error was calculated by the expert trying to qualify the test all indicate that any testimony regarding this test is inherently unreliable.

## CONCLUSION

The testimony of Russell J. Kendzior will not assist the trier of fact to understand or to determine a fact in issue as the methodology underlying the testimony is not scientifically valid. Additionally, the probative value of Russell Kendzior's testimony is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury, and the Court in its gatekeeper function should keep his testimony from the jury. Fed. R. Evid. 403.

**WHEREFORE**, Defendants Greg Malinak and Debbie Malinak respectfully request that this Court exclude the testimony of Russell J. Kendzior as an expert at trial.

Respectfully submitted this the 14th day of June, 2017.

> */s Mabern E. Wall*
> JOSHUA M. BALL (# 020626)
> MABERN E. WALL (# 031328)
> Attorney for Defendants Greg and Debbie Malinak
> HODGES, DOUGHTY & CARSON, PLLC
> P.O. Box 869
> Knoxville, TN 37901-0869
> (865) 292-2307
> jball@hdclaw.com
> mwall@hdclaw.com

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **DEFENDANTS GREG MALINAK AND DEBBIE MALINAK'S MOTION TO EXCLUDE THE TESTIMONY OF RUSSELL KENDZIOR AS AN EXPERT AT TRIAL** was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's electronic filing system.

Said parties are:

Darren Vincent Berg, Esq.
Butler, Vines and Babb PLLC
2701 Kingston Pike
P.O. Box 2649
Knoxville, TN 37901-2649

Darryl G. Lowe, Esq.
Christopher C. Field, Esq.
Lowe Yeager & Brown
900 S Gay St Ste 2102
Riverview Towers
Knoxville, TN 37902-1810

This 14th day of June, 2017.

HODGES, DOUGHTY & CARSON, PLLC

*/s Mabern E. Wall*_____
Mabern E. Wall