IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

PHYLLIS G. BARNES and          §
WALTER R. BARNES,              §
     Plaintiffs,              §
                       §
VS.                            §
                       § NO. 3:15-cv-00556-PLR-HBG
GREG MALINAK, DEBBIE           §
MALINAK, and SIDNEY JAMES      §
MOTOR LODGE, INC., d/b/a       §
OLDE GATLINBURG RENTALS,       §
     Defendants.              §

------------------------------------
ORAL AND VIDEOTAPED DEPOSITION OF
RUSSELL J. KENDZIOR
MAY 22, 2017
------------------------------------


      ORAL AND VIDEOTAPED DEPOSITION OF RUSSELL J.

KENDZIOR, produced as a witness at the instance of the

Defendants, and duly sworn, was taken in the

above-styled and -numbered cause on May 22, 2017, from

10:21 a.m. to 2:20 p.m., before Angela L. Mancuso, CSR

No. 4514 in and for the State of Texas, reported by

Stenographic method, at the offices of Stryker

Reporting, 1452 Hughes Road, Suite 200, Grapevine,

Texas, pursuant to the Federal Rules of Civil Procedure,

Notice, and any provisions stated on the record.

1    Q.    And where --

2    A.    Here in Southlake.

3    Q.    That's in Southlake?

4    A.    Yes.

5    Q.    Okay.  We'll talk about that a little later.

6          Tell me about your education after high

7    school.

8    A.    I have a Bachelor of Science degree in

9    mathematics from Bradley University, and that was in

10   1985 that I graduated.

11   Q.    Okay.  How long did it take you to complete

12   your degree?

13   A.    Well, I worked and went to school and had to

14   take off, so it took about seven years.

15   Q.    Okay.  Other than your degree in mathematics,

16   do you have any other degrees of any kind?

17   A.    No.

18   Q.    No postgraduate degrees?

19   A.    No.

20   Q.    You're not a licensed engineer?

21   A.    I am not.

22   Q.    And you're not a licensed architect?

23   A.    No.

24   Q.    Okay.  Do you have any specialty-type training

25   or certifications in the field of slip-and-falls?

Case 3:15-cv-00556-PLR-HBG   Document 62-2   Filed 06/14/17   Page 2 of 49   PageID #: 432

 1     A.    Yes.

 2     Q.    Tell me about those.

 3     A.    Actually, it's a broader area.  It's walkway

 4  safety that --

 5     Q.    Okay.

 6     A.    -- involves slips, trips, many different types

 7  of stumbles, different falls.  I'm a Walkway Auditor

 8  Certificate Holder, or WACH, W-A-C-H, as better known,

 9  which is an ANSI accreditation.  It's a professional

10  designation issued through the National Floor Safety

11  Institute, which is the ANSI -- and that's A-N-S-I --

12  accredited training organization in the area of slip,

13  trip, and fall prevention.

14          I also have a training in -- from OSHA.  I

15  have both the 10- and 30-hour-level training from OSHA

16  in their general industry requirements for their Code of

17  Federal Regulations, Section 29, for occupational safety

18  and health.

19          I also have a license from the State of Texas

20  to perform walkway inspections, or inspections in

21  general, not just walkways, for the Texas Accessibility

22  Standard, or TAS.  I'm licensed as a registered

23  accessibility specialist with the State, through the

24  State's Department of Licensing and Regulations.  So I

25  do a lot of work with the -- what is commonly known as

Case 3:15-cv-00556-PLR-HBG  Document 62-2  Filed 06/14/17  Page 3 of 49  PageID #: 433

1  the ADA.

2          Received a lot of other forms of training

3  through my 20-plus years of experience, through

4  organizations like the National Safety Council, which I

5  served on their board of delegates for four or five

6  years; the American Society of Safety Engineers; the

7  American Society of Testing and Materials, or ASTM.  So

8  I've probably exhausted all the forms of training that

9  are available in my area of expertise.

10      Q.   Any of those that you mentioned, any of those

11  relevant to bath mats?

12      A.   Well, yes.  All areas of walkway safety,

13  whether it be mats or floors or rugs, which are all --

14  which are all, by the way, all different.  So --

15      Q.   Do you have any specific training in just bath

16  mats?

17      A.   Well, I -- what do you mean, bath mats?  This

18  is -- we're talking about a bath towel here.

19      Q.   Okay.  We've been referring to it as -- as a

20  cotton terry bath mat.

21      A.   Yeah.  It's actually a towel.  It's called a

22  mat.

23          And, no, I don't have any training in terry

24  cloth bath towels.  I do have experience in that area as

25  it relates to a pending standard that's being developed

1  right now by the ASTM for bath mat performance.  There

2  is actually a standard being developed for bath mats

3  right now, and I'm part of the committee on the ASTM

4  that's developing that standard.

5       Q.    I take it by you saying the standard -- the

6  ASTM standard is being developed, it's not out there yet

7  as a standard yet.  Is that correct?

8       A.    That's correct.  It's not published yet.

9       Q.    The walkway auditor via ANSI, was that a

10  course that you took?

11       A.    Yes.

12       Q.    How many hour course was that?

13       A.    It's four days, and so it takes a total of --

14  well, it's actually three days of training and a fourth

15  day as an examination day.

16       Q.    Okay.

17       A.    So it's 24 hours.

18       Q.    Twenty-four-hour course.  You had to take an

19  examination?

20       A.    A written exam and a audit.  You have to

21  perform a walkway audit.

22       Q.    Okay.  And did you pass that exam?

23       A.    I did.

24       Q.    Was there anything specific to cotton --

25  cotton terry bath mats in -- in that course?

Case 3:15-cv-00556-PLR-HBG  Document 62-2  Filed 06/14/17  Page 5 of 49  PageID #: 435

1    A.    No.

2    Q.    The OSHA 10- and 30-hour training regarding

3 CFR 29 -- I guess that is what it says -- you took a

4 10-hour course and a 30-hour course?

5    A.    Yes.

6    Q.    Okay.  And you're not saying that anything in

7 this case has anything to do with OSHA, are you?

8    A.    No.

9    Q.    Okay.  Anything in your OSHA training that was

10 specific to bath mats?

11   A.    No.

12   Q.    You mentioned you had a license in Texas to

13 perform walkway inspections regarding the ADA.

14         Do you have any licenses from the State of

15 Tennessee in anything whatsoever?

16   A.    No.

17   Q.    Okay.  And you're not contending that the ADA

18 is applicable in this case, are you?

19   A.    No.  My understanding is the plaintiff,

20 Ms. Barnes, is not or was not classified as being

21 disabled and therefore not protected by the class of

22 dis -- disability.

23   Q.    I believe you mentioned the National Safety

24 Council.  Was that a course?

25   A.    A series of courses.

1    Q.   How many hours?

2    A.   Gosh, it goes back quite a few years.

3  Probably four to eight hours total.

4    Q.   Okay.  And anything in the National Safety

5  Council course that had to do specifically with cotton

6  terry bath mats?

7    A.   No.

8    Q.   And the next one, if my shorthand is correct,

9  did you say American Society of Safety Engineers?

10    A.   Yes.

11    Q.   Okay.  And was that a course?

12    A.   Seminars.  All these were seminars or Webinars

13  or special training classes or programs.

14    Q.   Okay.  And you don't have to be an engineer to

15  be a member of the American Society of Safety Engineers?

16    A.   I don't know.  I don't know if you do or not.

17  I think there is some requirement for expertise or

18  experience in engineering.

19    Q.   But you're not an engineer?

20    A.   I'm not.

21    Q.   Okay.  Anything in any training you've taken

22  with the American Society of Engineers specific to

23  cotton terry bath mats?

24    A.   No.

25    Q.   And the last one I didn't get.  You mentioned

1   cleaning product that was a treatment called TP-421.

2   From there, the line grew.

3       Q.   Do you have any knowledge about what the floor

4   in this case we're here about today had been cleaned

5   with prior to the plaintiffs being in the bathroom?

6       A.   No.

7       Q.   Does anyone employed by Traction Plus have a

8   degree in engineering or architecture?

9       A.   No.

10      Q.   Anybody employed by Traction Plus have any

11  advanced degree of any kind?

12      A.   No.

13      Q.   1997 to present, you say "Founder & Chairman

14  of the Board of the National Floor Safety Institute."

15           So this is something that you founded; is that

16  correct?

17      A.   Yes.

18      Q.   And this is a 501(c)(3) nonprofit?

19      A.   Yes.

20      Q.   Tell me what the National Floor Safety

21  Institute does.

22      A.   The NFSI, as we're better known, has a fairly

23  simple mission of aiding in the prevention of slips,

24  trips, and falls through education, research, and

25  standards development.

 1  we actually authored a floor mat standard.  There is an

 2  ANSI standard for entranceway floor mats, and we do

 3  training on matting, and we -- but not a towel, which in

 4  this case is being used as a mat.

 5          We do training on grab bars as well.  It's

 6  part of the walkway auditor training.

 7      Q.    Okay.  You said NFSI certifies products with

 8  ANSI, including bath mats.

 9          What bath mats do you certify?

10      A.    Well, what, by definition, constitutes a

11  mat -- maybe it'll help to start with that -- is that it

12  has to have a -- mats have a surface that you step on

13  that's absorbent, like cotton, but it also has a

14  specific and different backing.  The backing of the mat

15  is different than the face of the mat.

16          And so the backing that we test for

17  manufacturers for slip resistance are the type that have

18  like a rubber type of backing or -- there's different

19  synthetic material.  So if you go into, for example,

20  a -- I don't know -- JCPenney's and you buy a bath mat,

21  20-by-30-inch bath mat, you'll notice that they're all

22  NFSI certified.  It has the logo on the back.  But we

23  certify all types of mats, not just bath mats.  But we

24  certify entranceway mats, anti-fatigue mats, the various

25  types of floor matting products that are widely used

1   to term it, like the one that was used in this case,

2   have you?

3       A.   No.  I've never designed a towel.

4       Q.   Okay.  Do you give active lectures, talks now

5   in the field of bathroom safety with regard to bath

6   mats, grab bars?  Is that something you do on a regular

7   basis?

8       A.   I've done those types of programs.  I wouldn't

9   say on a regular basis.  I think we've discussed some of

10  the training I've done over the years in that area.

11      Q.   Your publications that we've talked about,

12  have those been peer-reviewed?  And I guess I should ask

13  you if you know what peer-reviewed means.

14      A.   Yes and no.  Yes, I know what it means.  And,

15  no, they have not been peer-reviewed.

16      Q.   Okay.  Have any of your publications been

17  peer-reviewed?

18      A.   I don't write to that industry, so, no.

19      Q.   Okay.  And when you say "that industry," what

20  are you referring to?

21      A.   The technical industry, the scientific

22  industry, which is where peer review is important.  I've

23  been a peer reviewer, but I don't author peer-reviewed

24  stories, research.

25      Q.   Other than the ones we have talked about, your

 1   any of your opinions in this case?

 2       A.    No.

 3       Q.    Have you ever talked to the plaintiffs, either

 4   Phyllis G. Barnes or Walter R. Barnes, about any of the

 5   issues in this case?

 6       A.    No.

 7       Q.    Did anybody tell you that the plaintiffs

 8   weren't available to talk or couldn't remember the

 9   events or anything like that?

10       A.    No.

11       Q.    Have you corresponded with the plaintiffs

12   about any issues in this case?

13       A.    No.

14       Q.    And you haven't talked with or corresponded

15   with any of the named defendants in this case, have you?

16       A.    No.

17       Q.    In looking at your file and materials you

18   reviewed, I didn't see in there where you had reviewed

19   any of the defendants' answers.  Is that correct?

20       A.    Unless they were on the disk, I didn't receive

21   them.  I obviously didn't review them.

22       Q.    Okay.  We'll look at the disk at a break.

23             Did you have any conversations with

24   plaintiffs' counsel about the facts of the case?

25       A.    Probably when I was initially retained, by way

1  of a telephone call they described the case, the

2  situation, the basic facts.  I say that because that's

3  traditionally what happens.  Before I accept being --

4  taking on a case, they kind of give me the facts.

5      Q.   And you don't make any notes when you have

6  those telephone calls?

7      A.   No.

8      Q.   Okay.

9      A.   Because a lot of times I turn down the case or

10 I never hear from the attorney again.  So --

11     Q.   So your opinions and conclusions in this case

12 were derived from the facts and data that are contained

13 in your file that we reviewed and on the thumb drive

14 that we're going to review and the things you cite in

15 your reports; is that correct?

16     A.   Yes.

17     Q.   Okay.

18     A.   In fact, my opinions are based on what I cite

19 in my report.

20     Q.   And you haven't been to this condominium where

21 the plaintiff fell in Gatlinburg, Tennessee, have you?

22     A.   No.

23     Q.   Did you send anyone to this condo on your

24 behalf to do any testing or examine the scene for you?

25     A.   No.

52

1  that are expressed that I assume are yours.

2      A.    Yes.

3      Q.    Okay.  If you will turn to page 2 on

4  Exhibit 1, the second paragraph, the first block

5  paragraph, it starts with, "Sidney James Motor Lodge

6  d/b/a Olde Gatlinburg Condominium Rentals and the owners

7  Greg and Deb Malinak breached the standard of care they

8  owed to the Plaintiffs to provide them a bath mat that

9  would not slip when used for exiting the bathtub."

10          What, if any, codes, laws, standards,

11  ordinances do you point to to support that contention?

12     A.    That the mat was slippery?

13     Q.    For your statement that I just read that

14  owed -- "breached the standard of care that they owed to

15  the Plaintiffs to provide them a bath mat that would not

16  slip when used for exiting the bathtub."

17     A.    Yeah.  There's actually several standards, and

18  they're actually in my second report, I guess, what I

19  call my report.  One's an ASTM standard, and the other

20  one is the ANSI B101.6 standard that calls for matting

21  to have a slip-resistant backing.

22     Q.    Both the ASTM and ANSI standards are voluntary

23  standards, aren't they?

24     A.    Yes.

25     Q.    And what does -- what does that mean to you

1  when I say "voluntary standard"?

2      A.    They're not mandated by law.

3      Q.    They're not mandated by any law in Sevier

4  County, Tennessee; Gatlinburg, Tennessee; or the State

5  of Tennessee, are they?

6      A.    No.

7      Q.    Next there in that same paragraph, about four

8  lines down, you say specific -- I'm quoting --

9  "Specifically, these Defendants failed to provide a

10  suitable bath mat for the type of flooring that was in

11  the condominium rented by the Plaintiffs on the day in

12  question.  Bath towels are not bath mats and should not

13  be used as such."

14      A.    Uh-huh.

15      Q.    Are you again relying on ASTM and ANSI for

16  those statements?

17      A.    Well, not only ASTM and ANSI, but this subject

18  bath mat was not a mat.  It was a towel.  And it's not

19  intended to be used as a mat.  It's an absorbent towel.

20      Q.    What is your basis for saying that it's not

21  intended to be used as a mat?

22      A.    It's not marketed or sold as a mat.  I mean,

23  the companies who produce bath towels do not label them

24  as bath mats.

25      Q.    Have you stayed in hotels, motels, or other

58

1    A.    It appeared to be some type of a vinyl tile

2  surface.  It was a tile of some type.  I think

3  Mrs. Barnes referred -- referred to it as linoleum.

4    Q.    Okay.

5    A.    But it appeared to be a synthetic tile.

6    Q.    When you say "synthetic tile," what does that

7  mean?

8    A.    Meaning some type of vinyl or linoleum-type

9  material --

10   Q.    Okay.

11   A.    -- versus that of a ceramic tile.

12   Q.    Okay.

13   A.    But again, that's based on Ms. -- the

14  Barneses' testimony as well as the photographs.  I

15  didn't actually see the tile firsthand.

16   Q.    Okay.  Some kind of synthetic tile like vinyl

17  or linoleum?

18   A.    Yeah, or it could have been ceramic.  I just

19  don't know.

20   Q.    Okay.  You've never tested the actual floor?

21   A.    No.

22   Q.    Are you aware of any prohibition against vinyl

23  floors in overnight rental accommodations in Sevier

24  County, Tennessee?

25   A.    Wow, that's a -- prohibition by who?

1    Q.    Laws, ordinances --

2    A.    No.

3    Q.    -- regulations, anything you can point to that

4    says you can't have vinyl floors in a bathroom in an

5    overnight rental in --

6    A.    No.

7    Q.    -- Sevier County, Tennessee?

8    A.    No, not that I know of.  I don't know of

9    prohibition of floors anywhere, for that matter.

10   Q.    Your next sentence there, it says, bath --

11   quote, "Bath towels are not bath mats and should not be

12   used as such."

13          Is that based on ASTM?  ANSI?  What's that

14   based on?

15   A.    Well, you don't use towels as mats because a

16   towel is not a mat, regardless of the fact that, at

17   least in this case, they're referred to as mats.

18   They're not.

19          It's like saying let's put paper towels -- or

20   better yet let's take a piece of cardboard.  Put that on

21   the ground and call it a mat.  People do that.  Go into

22   industrial applications where they put card -- they put

23   cardboard down.  Well, cardboard is not a mat any more

24   than a towel is a mat.  So it's really by the definition

25   of the term "mat."

1       A.    Probably all the above, yeah.  Both.  And lack

2   of grab bars.

3       Q.    I'm going to show you a copy of the American

4   National Standard, I believe, that you cited in the next

5   section of your first report as facts or data you

6   considered in forming your opinions.

7            Does that look like the ANSI standards?

8       A.    Yes.

9       Q.    Okay.  If we could make that the next exhibit,

10  please.

11           (Deposition Exhibit 6 marked)

12      Q.    And do I have the right section?  I think I

13  do.  1264.2, 2012, is what you said you relied on and

14  that's what --

15      A.    Yes.

16      Q.    And what number is that?

17      A.    6.

18      Q.    6.  If you'd look on -- it's not numbered, but

19  it's the fourth page.  Looks like this.

20      A.    Oh, okay.  Yes.

21      Q.    Sort of introductory remarks.  If you'd look

22  about midway down through there -- and I'm quoting -- it

23  says, "The use of American National Standards is

24  completely voluntary."  Is that -- did I read that

25  correctly?

74

1   than it is wider.

2       Q.   So like when you walk into Walmart after it's

3   been raining --

4       A.   Yes.

5       Q.   -- is that a runner?

6       A.   That's a runner.

7       Q.   Okay.

8       A.   I don't know if it matters, but you brought it

9   up earlier about warnings.

10      Q.   Yes.

11      A.   That's also a section.

12      Q.   Which section is that?

13      A.   Section 9.

14      Q.   Is there a specific subsection in 9 that

15  applies?  Or you say all of 9 applies?

16      A.   Most of 9, not all, but many of the sections

17  in 9 apply.

18      Q.   Next, you cite the National Floor Safety

19  Institute 101-C.  Is that a correct copy of what you

20  cited?

21      A.   Yes.

22      Q.   Could we make that the next numbered exhibit,

23  please.

24              (Deposition Exhibit 7 marked)

25      Q.   And this is the one you created, founded, the

1    National Floor Safety Institute; is that correct?

2        A.    Yes.  This is their standard.

3        Q.    Did you write this standard?

4        A.    I was one of the co-authors, yes.

5        Q.    And this is dealing with testing the

6    coefficient of friction; is that right?

7        A.    The transitional coefficient of friction, yes.

8        Q.    Transitional?

9        A.    Yes.

10       Q.    In Section 1.3 of Exhibit 7, the last

11   sentence, you say, quote, "No express or implied

12   representation or warranty is made regarding accuracy or

13   significance of any test results in terms of slip

14   resistance."  Period.  End quote.  Is that right?

15       A.    Yes.

16       Q.    What do you mean by that?

17       A.    Well, it's up to the user, the manufacturer,

18   to decide for themselves what they would consider

19   appropriate for their -- their application of a mat.

20       Q.    Do -- somebody who downloads this, do they

21   have to pay for a copy of this document?

22       A.    I don't know.  That's a good question.  I

23   don't know.  They might.  I know -- I know the ANSI

24   standards, there is a cost.  But there is a period of

25   time where I don't think we charged for downloads of

1  this standard.  That may have changed.

2      Q.    In Section 1.4 of Exhibit 7, the NFSI

3  standards, you state, quote, "This test meth" -- excuse

4  me -- "This test method is not recommended for wet

5  surface testing and does not propose to be an accurate

6  measurement method for determining wet surface slip

7  resistance."  Period.  End quote.

8          Do you know whether the bathroom floor was wet

9  or dry when Ms. Barnes stepped out, in the area where

10  she stepped out of the tub?

11      A.    I don't know.  When you say "wet," meaning

12  water on the floor or --

13      Q.    Yeah.

14      A.    I think she talked about humidity.  There was

15  an exhaust fan or something that would take -- when you

16  shower, it kind of gets foggy.  So that level of

17  humidity was present.  But it's my understanding that

18  the floor was not wet.

19      Q.    And this standard, the National Floor Safety

20  Institute standard that we're looking at, it is also a

21  voluntary standard; is that right?

22      A.    Yes.

23      Q.    It is not legally applicable to rental condos

24  in Sevier County, Tennessee, is it?

25      A.    Well, again, it's not -- it's not a law.

1  There is no mandated use of the standard --

2      Q.    No --

3      A.    -- by law.

4      Q.    No code, no Sevier County code, ordinance,

5  Tennessee law, anything like that has adopted the

6  standard, have they?

7      A.    Not that I know of, no.

8      Q.    Take a look at Section 5, if you would, before

9  we leave Exhibit 7.

10     A.    Okay.

11     Q.    Calculation/Data Interpretation.  You say,

12  quote, in the second -- third sentence -- I'm sorry --

13  last sentence in that first part, "Dry" is that

14  "transitional coefficient of friction values of 0.50 or

15  greater are those that demonstrate High Traction

16  characteristics as defined in this standard."  End

17  quote.

18          What's the basis for that statement?

19     A.    What do you mean, the basis?

20     Q.    This standard that you've professed here of

21  0.50 or greater demonstrates high traction, how -- how

22  did you arrive -- what's the basis for that standard?

23  How did you arrive at 0.50?

24     A.    Okay.  Good question.  The standard is based

25  on a normal person's ambulation.  If you were to watch

1      A.    Yes.

2      Q.    And the ASTM standards are also voluntary and

3   non-mandatory, aren't they?

4      A.    Yes.

5      Q.    Okay.

6      A.    But it also talks about enhancing safety.

7      Q.    Okay.  Are you aware of any Tennessee or

8   Sevier County code, law, ordinance, anything like that

9   that adopts the ASTM standards?

10     A.    Oh, I'm sure there are.  I don't know of

11  every -- I don't know every standard that the county

12  recognizes.  That's kind of -- puts me in an unfair

13  position to answer that question.  I'm not an expert on

14  what the county -- every county standard or code that's

15  referenced would be.

16     Q.    Have you looked at any Tennessee laws as part

17  of your work in this case?

18     A.    No.

19     Q.    Have you looked at any Sevier County building

20  codes?

21     A.    No.  This has nothing to do with building

22  codes.

23     Q.    Have you looked at any Sevier County

24  ordinances?

25     A.    No.

82

1      Q.   So I'm looking at Exhibit 9, which is

2   F1637-10.  I'll narrow my question.

3          Are you aware of any Tennessee law or Sevier

4   County ordinance, code, anything at all that references

5   or adopts ASTM F1637-10 to make it applicable in Sevier

6   County, Tennessee?

7      A.   No.

8      Q.   Okay.  And which portions of -- or is it all

9   of Exhibit 9, F1637-10, that you say is applicable to

10  this case?

11     A.   No.  Section 1, Scope, of course defines,

12  second sentence, first paragraph.  "This practice is

13  intended to provide reasonably safe walking surfaces for

14  pedestrians wearing ordinary footwear.  These guidelines

15  may not be adequate for those with certain mobility

16  impairments."  And so this is really designing or

17  defining what is the standard of care for a safe walking

18  surface, number one.

19          And then the only other section that applies

20  is Section 5.4, which is Mats and Runners, and it kind

21  of defines the importance of using a mat and a runner --

22  or a runner.

23          This particular towel does not constitute, by

24  definition, a mat or a runner.  And so this ASTM F1637

25  standard kind of sets forth the provision for proper use

1  of such mats and runners, where, in this case, there was

2  no mat or runner used.

3      Q.    That sentence you just read, under Scope,

4  says, "This practice is intended to provide reasonably

5  safe walking surfaces for pedestrians wearing ordinary

6  footwear."

7      A.    Right.

8      Q.    Ms. Barnes wasn't wearing ordinary footwear,

9  was she?

10     A.    No.

11     Q.    So then how is F1637-10 applicable at all?

12     A.    Well, this is a towel that's used in the

13  bathroom where people may come into the bathroom after

14  they're showered and step on it with a shoe or footwear.

15  It's not specific.  In other words, the bath towel that

16  you mentioned are widely used in hotels, I would expect

17  that people do walk into the bathroom and step on them

18  both without shoes and with shoes.  So the product

19  itself, the towel, has to sustain a level of safety with

20  shoes and, in the case of Ms. Barnes, without shoes.

21     Q.    Look at Section 4, if you would, please,

22  Significance and Use.

23     A.    Uh-huh.

24     Q.    Last sentence says, "Swimming pools, bath

25  tubs, showers, natural walks, and unimproved paths are

1  26-inch-by-21-inch terry cloth bath towel.  So that's

2  how it's referenced.  The 3-inch-by-3-inch section that

3  was cut out of it was actually cut out per the NFSI test

4  method.  That's the size of the sample that's required

5  to -- to test.  Measurements were taken in four

6  directions and averaged as it relates to the bath towel.

7  And a transitional coefficient of friction value was

8  generated.

9      Q.   What was that transitional coefficient of

10  friction figure?

11     A.   It's on page 3 of my report, second paragraph.

12  The value was 0.14.

13     Q.   Did you use a tribometer?

14     A.   Yes.

15     Q.   Tell -- tell me about that process.  I've

16  never used a tribometer.  I know what they do.  I've

17  never -- never used one.  Only seen pictures.  Tell

18  me -- walk me through that process of how you tested

19  this, what you call bath towel.

20     A.   The tribometer that's specified within the

21  NFSI 101-C standard is a device called the Brungraber --

22  that's B-r-u-n-g-r-a-b-e-r -- Mark II test device.  And

23  it's a articulated strut device where you can change the

24  angle of the strut so as it's coming down on the floor,

25  you get a change of angle.

1          It has a 5-pound weight that comes down at the

2   designated angle.  It transfers the weight through a

3   3-inch-by-3-inch metal plate which is mounted onto the

4   strut.  And so this particular bath mat is attached to

5   the plate, so it's going to strike the ground with the

6   mat attached, if you will, to the articulated strut.

7          Beneath the device is a standardized tile.

8   It's called -- it's a calibration tile that has a known

9   coefficient of friction of 0.5, which is kind of an

10  average tile.  It's not high traction.  It's not low

11  traction.  It's kind of an average coefficient of

12  friction tile.

13         And so once the tile -- I'm sorry -- the mat

14  strikes the tile at whatever designated angle, kind of

15  simulates somebody stepping on the mat at that angle.

16  And it -- and when it contacts the tile, the mat -- in

17  this case, the towel will actually slide or it will

18  stick, meaning it won't move.  It won't slip on the

19  floor.

20         And so any value above a 0.5 would constitute

21  a high-traction material, meaning if you were to walk

22  across it at that angle, it wouldn't slip.  In this

23  case, it was very low, 0.14, which means this particular

24  towel will move at a very, you know, steep angle.  Just

25  walking across it, it's going to move without stepping

1  on it at a -- at a extended gait.

2     Q.   How did you arrive at the angle that you used

3  for the testing?

4     A.   On the device, you continue to rotate it.  You

5  continue to rotate the angle until it doesn't slip.  And

6  so a value of point -- of -- of less than 0.14, it was

7  not sliding, or slipping, I should say.  So at a value

8  of 0.10, it wouldn't slide.  At a value of 1.11, it

9  doesn't slide.  But then when we got up to value of

10 0.14, that's what triggers to slip.  And that's the

11 number that's recorded.  And it's an average of four --

12 this sample is rotated in four directions.  So it's

13 tested in that direction, this direction, this direction

14 to get an average direction.

15    Q.   Do you know what angle Ms. Barnes stepped out

16 of the tub onto the towel?

17    A.   No.  I don't know.  I wasn't there.  I don't

18 know.

19    Q.   And you said you used a test tile to test the

20 transitional coefficient of friction; is that correct?

21    A.   Yes.

22    Q.   The floors in this condo are not tile, though,

23 are they?  They're vinyl or linoleum.

24    A.   Yes.  And again, we're just using a

25 representative average type of floor material.  In this

1  case, as I said, I don't know what the coefficient of

2  friction of the tile was in this particular bathroom,

3  but it would be comparable to an average surface, I

4  assume.

5      Q.   Did you do this testing you've described, or

6  did you have someone else do it?

7      A.   No.  I did it.

8      Q.   Under the Background section on Exhibit 10,

9  about midway down there, you say, quote, "The bath towel

10  was provided by the Defendant as a bathmat."  And you go

11  on.

12          Are you referring to one defendant or all

13  defendants?  Who were you referring to there?

14      A.   I would presume all the defendants.  But

15  specifically the defendant, your -- your client, who was

16  providing this for use as a room.

17      Q.   Next sentence there, you say, "The flooring

18  material in room number 504 was that of a smooth and

19  lightly colored 12" X 12" tile."

20      A.   Uh-huh.

21      Q.   Where did you get those measurements?

22      A.   If you look at the photograph we talked about

23  earlier, you can see the lines in the tile.  Looks like

24  a vinyl tile.  Vinyl tile has a 12-inch-by-12-inch,

25  roughly, pattern.  You can see that there is actually

1 | some spaces between the tile.  So it was kind of an

2 | estimate.

3 |         It also could have been a pattern in the

4 | floor, for example, say this was one big piece of vinyl

5 | and these lines are just the pattern that was printed on

6 | it so there's no gaps.  But it's the same type of

7 | vinyl-type material, lightly colored.  And so 12-inch by

8 | 12-inch doesn't necessarily mean it's the size of the --

9 | of the material, but the size of the pattern on the

10 | material.

11 |     Q.    May I see that picture?  We've been talking

12 | about it, and we haven't referenced.  It's in your file

13 | which we've marked as an exhibit.  It's Deposition

14 | Exhibit 7 in Ms. Barnes that's in your file.  That's the

15 | one --

16 |     A.    Yes.

17 |     Q.    -- we've been talking about.

18 |     A.    Yes.

19 |     Q.    Next in the background, last sentence, you

20 | say, "A vertical grab bar was not installed in

21 | bathtub/shower enclosure."

22 |         This is the first time I've seen that issue

23 | come up.  How did this come about, this grab bar issue?

24 |     A.    Well, it didn't just come about.  It was an

25 | observation made which is relevant to this case.  There

1  is no grab bar that I'm aware of that was actually

2  mounted in the -- or on the support wall or anywhere

3  near the bathtub, the critical support or the

4  noncritical support wall, which would have been a

5  vertical mounted grab bar, meaning --

6      Q.   Up and down?

7      A.   -- up and down.  So if somebody is getting in

8  and out of the tub, they can hang on to it.

9      Q.   Did either Mr. or Ms. Barnes mention anything

10  to you about the lack of a grab bar?

11      A.   I don't think they mentioned a grab bar.

12      Q.   Plaintiffs' attorney mention about the lack of

13  a grab bar?

14      A.   No.

15      Q.   This is something you came up with on your own

16  in looking at photographs or how?

17      A.   Yes.

18      Q.   Okay.  Under your Opinions section there on

19  Exhibit 10 and the Grab Bar heading, you state, quote,

20  "It is my opinion that the Defendant should have

21  provided at least one vertically mounted grab bar near

22  the front critical support service wall of the

23  bathtub/shower enclosure as to assist bathers as they

24  enter and exit the tub-shower enclosure as required by

25  the American Society of Testing and Materials (ASTM)

1   F-446-99" -- quote -- "'Standard Consumer Safety

2   Specification for Grab Bars and Accessories Installed in

3   the Bathing Area.'"  End quote.

4        Again, as we've talked, the ASTM is a

5   completely voluntary standard, isn't it?

6     A.   Yes.

7     Q.   And it is not legally applicable to this condo

8   in Sevier County Tennessee, is it?

9        MR. BERG:  Object to form.

10     A.   I don't know, but I don't think so.

11     Q.   (BY MR. BALL)  Okay.  You're not aware of any

12   Tennessee law, Sevier County building code, ordinance,

13   or any other provision of Tennessee law or Sevier County

14   local law that references this ASTM F-446-99 or adopts

15   it in any way, are you?

16        MR. BERG:  Objection; form.

17     A.   The Americans With Disabilities Act, the ADA,

18   is requiring grab bars.  If I'm not mistaken, they

19   reference this standard.

20        The reason I didn't include that in my report

21   is Ms. Barnes, to my understanding, was not disabled.  I

22   think we talked about that earlier.  And so I don't want

23   to mislead the jury by saying, well, there was a

24   violation of the ADA.  Well, she wasn't disabled.  But

25   the ADA does apply to every county in the country.  And

1   so the use of grab bars is -- is referenced by way of

2   law in the ADA.

3       Q.   (BY MR. BALL)  But if Ms. -- if I understand

4   you correctly, if Ms. Barnes is not disabled, then the

5   ADA does not apply to her.  Is that what you're saying?

6       A.   That's what I'm saying.

7       Q.   Okay.

8       A.   But -- but your question was, are there laws

9   that --

10      Q.   Yes.

11      A.   -- require grab bars?  And the answer is yes.

12      Q.   Do you know whether or not Ms. Barnes or

13  Mr. Barnes, either one, requested any type of special

14  room to accommodate a disability or anything like that?

15      A.   I don't know.

16      Q.   On page 2 there, the last paragraph before

17  Bathmat, you state, "Based on the above-named nationally

18  recognized industry consensus standard for

19  bathtub/shower enclosure grab bar usage, it is clear

20  that the bathtub/shower enclosure in question was not in

21  compliance and therefore presented an unreasonably

22  dangerous condition."  End quote.

23          Is the nationally recognized industry

24  consensus standard you're referring to ASTM F-446-99?

25      A.   Yes.

99

1  myself are friends.  We've known each other for over 25

2  years.  He and I personally worked and used his device

3  many years ago.  So I guess I was trained by him.  He

4  has since retired, and his device and company is owned

5  by a new company, and they have a more advanced version

6  of it, which I don't really work much with them.

7      Q.   Do you know when the tribometer you used to

8  test the towel in this case was last calibrated by the

9  manufacturer?

10     A.   There is a sticker on the side of it.  I don't

11 know the date.  But it's been several years.

12     Q.   Would you agree that within the industry there

13 is some dissension as to whether there is any

14 correlation with regard to tribometer readings to actual

15 human slip accidents?

16     A.   Well, it depends.  There is 70 -- that I'm

17 aware of, about 70 different ways to measure surface

18 friction, which is what tribometers measure.  Many of

19 them are laboratory mounted.  Some are portable.  They

20 use various sensors, different operating methodologies

21 and procedures.  So they're all different, and so

22 obviously there is going to be different outputs from

23 these various devices.

24          For the most part, most of them have no real

25 test method to support their use.  For example, you can

1  go out and use a Brungraber test device on a floor and

2  come up with a number.  And when asked, well, what does

3  the number mean, the answer is we don't know because

4  there is no standard, no method, nothing.  It's just --

5  pardon the phrase -- a gadget.

6          The Brungraber, when used to measure floor mat

7  backings, does have credibility because there is a

8  published and reviewed -- revised and reviewed standard

9  specifying how to use it and defining what output

10  values, what they mean.

11          And so to answer your question, there is a lot

12  of gadgets that people run around with using, most of

13  which have little to any credibility.  The few that do

14  have credibility are codified by way of a national

15  standard, ANSI or otherwise.  And those are the ones

16  that the NFSI and I rely upon, which is a very small

17  number of devices.

18      Q.   And you're not aware of any Tennessee law,

19  Sevier County ordinance, building code, or other

20  standard adopted by Sevier County that adopts or

21  references either the NFSI standard or this value of 0.5

22  as far as TCOF, are you?

23      A.   No.

24      Q.   Same question with regard to a methodology for

25  quantifying slip resistance.  Can you point me to any

1 Tennessee law, Sevier County, Tennessee code, ordinance,

2 or other standard that identifies a methodology for

3 quantifying slip resistance?

4      A.    Of?

5      Q.    Something like a bath towel in this case.

6      A.    No.

7      Q.    All of the standards and methodology for

8 testing coefficient of friction that you mentioned in

9 your report are completely voluntary standards, aren't

10 they?

11     A.    They are voluntary, yes.

12     Q.    And there are no codified laws or standards in

13 Tennessee or Sevier County, Tennessee, that establish

14 0.5 or any other value as the minimum required

15 coefficient of friction or slip-resistance value, are

16 there?

17     A.    Of towels?

18     Q.    Yes.

19     A.    I don't know.

20     Q.    If you'd look with me on page 3, it's the

21 fourth paragraph down, starts with "Furthermore."

22     A.    Yes.

23     Q.    Look there, please.  You say -- you cite

24 ASTM 1637-09 and say -- it says that "Mats, runners, and

25 area rugs shall be provided with safe transition from

1      A.    Yes.

2      Q.    On the other hand, say you put some adhesive

3   on a piece of sandpaper and put that down on a bathroom

4   floor, you put the same towel on top it, that's going to

5   be a much more stable surface.  Correct?

6      A.    Well, you're more likely to have less

7   slippage.

8      Q.    Right.

9      A.    I wouldn't say it's more stable.

10      Q.    The -- the bath mat has not changed in either

11   of those two hypotheticals I presented you, correct?

12      A.    Yes.

13      Q.    But the floor surface has changed, correct?

14      A.    Yes.

15      Q.    And that's going to have some impact on how

16   slip resistant that bath mat is, correct?

17      A.    Yes.

18      Q.    Because it's the interaction between that

19   surface and that mat.

20           So this standard that was created for creating

21   a standard manufacturing type of value for bath mats,

22   it's not necessarily suited for a forensic application,

23   correct?

24      A.    Why not?

25      Q.    Because it ignores one of those variables,

125

1  floor coverings.

2      Q.   So who created the NFSI 101-C along with

3  yourself?

4      A.   We had, I think, a sub -- well, there was a

5  subcommittee of three -- two or three people.  I

6  don't --

7      Q.   A subcommittee of what?

8      A.   That wrote the standard.

9      Q.   But -- but what organization?

10     A.   NFSI.

11     Q.   Of NFSI?

12     A.   Yeah.  There was no ANSI committee at the time

13  NFSI 101-C was first developed.

14     Q.   Was NFSI 101-C ever subject to peer review?

15     A.   Well, standards are not -- in this -- in this

16  context are not peer reviewable.  They're -- the NFSI

17  standard specifically is a bit different than, say, an

18  ANSI or ASTM standard.  Those are created by committees.

19  They're consensus body committees.

20          NFSI is more like UL, Underwriter

21  Laboratories.  UL creates UL standards for themselves,

22  and industry there -- follows them and submits to them

23  or not.  It's voluntary.  NFSI develops their standards

24  much like the UL.  They're private standards.  They're

25  voluntary.  And industry can either adopt them or not.

1    Q.   Okay.  So these standards were never sent to

2 any other engineers during their creation for any sort

3 of review and feedback analysis-type process?

4    A.   I don't know what you mean by "other

5 engineers."  What other -- it was a standard that was

6 created by and for the NFSI, approved and codified by

7 the NFSI board of directors, published as an NFSI

8 standard, as a voluntary standard.

9         It has since gained a lot of popularity and

10 recognition by industry -- we talked about that

11 earlier -- who relies upon it and actually has their

12 products, their floor mats, tested to the standard.

13    Q.   Are you aware of anyone other than yourself

14 that uses the standard for forensic application?

15    A.   I'm sure quite a few people do.  It's a -- it

16 is -- you mean NFSI 101-C?

17    Q.   Yes.

18    A.   It is the only recognized standard for

19 measuring slip resistance of backings that I'm aware of

20 in the world.  And so anyone that's doing work in this

21 field purchases the standard.  We sell many of the

22 copy -- the standard's being sold, so I assume people

23 are using it, and it's being sold to a wide range of

24 engineers and attorneys and presumably engineers that

25 are acting as forensic engineers in matters like this.

1  vast majority of floor mat manufacturers use it.  I can

2  only assume that of the hundreds of thousands of

3  applications, when you add it all up, that this floor

4  mat standard is widely used in the forensic expert

5  profession.  But I don't know these people, because how

6  would I?

7      Q.   So it's only an assumption?

8      A.   Well, how would I know if your client is, say,

9  getting sued by somebody and there is a forensic expert

10 retained that's using the standard?  How would I know

11 that?  How would I know all these people?  That's what

12 I'm saying.  You're kind of setting me up with a false

13 pretense.  How would I know every single slip-and-fall

14 lawsuit that was taking place or a forensic engineer

15 that's involved in a lawsuit?  I don't know.  That's

16 beyond my -- my knowledge.

17     Q.   Did you consult with the manufacturer of the

18 tribometer in drafting NFSI 101-C?

19     A.   No.

20     Q.   Do you know whether taping a sample on the

21 tribometer deviates from the tribometer instructions?

22     A.   Well, the tribometer -- I don't know what

23 their current instructions say, but the tribometer

24 itself is defined as a floor tester.  That's what they

25 sell it as today.  We're not using it as a floor tester.

1  Using it as a floor mat backing sensor device.  And so

2  the instructions as a floor tester I would presume would

3  be different than a floor mat backing --

4      Q.    Okay.  Just so -- just so it's clear on the

5  record, NFSI 101-C states that you take -- for

6  example -- do you mind if I pick this up?

7      A.    Uh-huh.

8      Q.    So you take this particular --

9      A.    Material.

10     Q.    -- piece of material and you apply an adhesive

11  to it.

12     A.    No.  Tape.

13     Q.    Tape?

14     A.    There is actually tape on the foot, and you

15  just take that and -- it's a double-sided tape.  You

16  just adhere it to the tape.  And then you peel it off

17  when you're done.

18     Q.    Okay.  And -- and it sticks on that foot and

19  you --

20     A.    Yes.

21     Q.    Okay.  Yeah.  And --

22     A.    That's it.  It's a pretty simple concept, and

23  it's really very appropriate because it does simulate,

24  you know, even though it's backwards.  It's -- instead

25  of a foot coming down on the mat, it's -- or in this

132

1   application as described in NFSI Standard 101-C?

2       A.    Well, again, you're confusing two things.

3   We're not using the tribometer according to the

4   manufacturer's -- the new manufacturer's instructions.

5   The previous manufacturer, Dr. Brungraber, who owned a

6   company called Slip-Test, that's the earlier -- are you

7   talking about the current instructions?  Which

8   instructions are you talking about?

9       Q.    Well, let's talk about both.  Take the old

10  instructions first.

11      A.    Right.  Very -- the old instructions were

12  really designed, I guess, as they are now for -- as a

13  floor tester.  So we're not using the device as a floor

14  tester.  So to us, the instructions are irrelevant.

15  We're not using it that way.

16      Q.    So the -- any error rate would be inapplicable

17  because of the deviation from the instructions?  And I'm

18  talking about the old set of instructions.

19      A.    Well, since I'm not familiar with the new set

20  of instructions that have been used for the Brungraber

21  Mark III, because I think they don't even make the

22  Mark II anymore.  I think the instructions are

23  completely different.  We -- we don't employ the device

24  the way the instructions detail because it's -- they're

25  being used to measure floors.

1  know -- maybe you're just asking the wrong --

2      Q.    A known --

3      A.    -- the question the wrong way.

4            Known error?  What is the known error of the

5  Brungraber device?

6      Q.    Yes.

7      A.    Is that what you're asking me?

8      Q.    Yes.

9      A.    As I mentioned earlier, I think the degree of

10 accuracy is plus or minus roughly 5 percent.  Might be

11 less than that.  In the con -- way we're using it --

12     Q.    Well --

13     A.    -- that's our method.

14     Q.    Well, that error rate is based on its use as a

15 floor tester is the way you described it, correct?

16     A.    We're not using it that way.

17     Q.    Right.

18     A.    The 5 percent error rate is the way we're

19 using it.

20     Q.    How do you know what the error rate is?

21     A.    Because we measured it.  We -- I think the

22 question came up earlier about when is the last time

23 this device was calibrated.

24     Q.    Uh-huh.

25     A.    Okay.  Well, the manufacturer of this

1  particular device is long gone.  He's out of business.

2  The new manufacturer, I guess, could calibrate it.  But

3  they're calibrating it for a different purpose.

4        So what we do is we -- we own this device.  We

5  use this device.  We control it.  It's in our

6  laboratory.  And so the rate of error is quantified as

7  approximately plus or minus 5 percent.  That's the error

8  rate as we use the device.  So -- is that what you're

9  asking me?

10     Q.    And so you came up with that error rate?

11     A.    We calculated it.

12     Q.    Okay.  And is that published anywhere in that

13  standard?

14     A.    No.

15     Q.    Okay.  Where is the -- is there any

16  documentation of the testing to come up with that error

17  rate?

18     A.    Well, it's an approximate value.  And that's

19  based on the fact -- well, you brought it up.  It's

20  based on the fact that there are some factors that are

21  not exactly perfect.

22        For example, the tile is not a perfect tile.

23  There may be variations within the tile's coefficient of

24  friction.  The device is mechanical.  There is a certain

25  amount of movement.  You mentioned that there is a tape

136

1  that's used to hold the sample down.  When you add up

2  all those variables of movement or what could affect the

3  results, it's about a 5 percent deviation.

4           Now, 5 percent, you know, is a reasonable

5  deviation for a tribometer.  Most tribometers have

6  deviations greater than 5 percent, many of them, not

7  all, but many of them do.

8       Q.   Getting back to my question, is there any

9  documentation that shows how that error rate was

10 calculated?

11      A.   Maybe.  I don't know if there was or not.

12      Q.   Were you the one who calculated it?

13      A.   No, I didn't.

14      Q.   Who did?

15      A.   I'm not certain who on the subcommittee was in

16 charge of that --

17      Q.   Okay.

18      A.   -- when this was being developed.

19      Q.   Was there anyone with an engineering

20 background on that subcommittee?

21      A.   Probably.  We had a lot of folks who -- well,

22 we still have a lot of engineers that are on the

23 committee today that go back to the days of NFSI.  So --

24      Q.   But you said it was a three-person

25 subcommittee?

 1    Q.    No.   I'm referring to the auditor of the test.

 2  There is a tech -- under NF -- I'm sorry -- NFSI 101-C,

 3  there is a technician and then there is an auditor,

 4  correct?

 5    A.    You're kind of mixing a couple of things up.

 6          The technician can be the auditor.  They're

 7  the same person.  Same pers -- it's the same person

 8  under two different names or titles.

 9    Q.    In the report you said the subject bath towel

10  was not affixed to the floor.

11          Are you suggesting that a fixation of a bath

12  mat is necessary to comply with the standard of care?

13    A.    Well, as a bath mat, no.  If you're using a

14  bath mat whose backing is within the compliance or the

15  standard of care, being slip resistant, then you would

16  not need to affix the mat to the floor.  But that's not

17  what happened in this case.

18    Q.    You mentioned that one time you stayed at a

19  Trump property as the example of when you have seen a

20  rubber-backed bath mat.

21          Was that particular mat placed in front of the

22  sink?  In front of the bathtub?  In front of the shower?

23    A.    Well, it was provided in the bathroom, and the

24  guest could put it wherever they want.

25    Q.    Okay.  So it wasn't already laid on the ground

1 | all I'm saying.

2 |        You know, I was asked for one.  Now you want

3 | two.  Right?  Is that what you want?  Two?  Three?  I'm

4 | telling you most hotels don't use them at all.  And if

5 | you're going to use them, you know, fine.  But

6 | understand there is inherent risk.

7 |        And I want to be clear.  Hotels use these a

8 | lot and are wrong.  It's a big mistake.  And that's why

9 | I've been retained in -- I don't know -- six, seven,

10 | eight lawsuits just like this.  Same stupid stuff.

11 | Using a towel as a bath mat and people get hurt.

12 |        You can go to the Grapevine, whatever that

13 | hotel is there, because -- in fact, that's a case I

14 | remember now that had the same problem.  I think they

15 | had two people slip and fall on bath towels at the

16 | Gaylord Texan.  Same thing.  Maybe that's a Marriott

17 | property.

18 |        So doesn't make it right.  Doesn't make it

19 | right.

20 |    Q.   Okay.  Back to your first report.  And I'm

21 | sorry.  I don't know what exhibit that was.

22 |    A.   1.  1.

23 |    Q.   Exhibit 1.  Okay.  At the time of that report,

24 | you did not have an exemplar in your possession,

25 | correct?

1      A.     That's correct.

2      Q.     Okay.  You make a statement in that report

3   about the thickness of the towel.

4      A.     Uh-huh.

5      Q.     What do you base your assessment of the

6   thickness of the towel on?

7      A.     Well, it was described to me.  And by the way,

8   what I actually received is exactly what I assumed it

9   was.  A terry cloth towel.

10     Q.     Okay.

11     A.     And so a terry cloth towel has a certain level

12  of cushion or thickness which it's designed to have to

13  absorb water.  That's what towels are for, for absorbing

14  water.  And so what I actually received was, although a

15  little bit different color -- I thought it would be

16  white.  It's actually kind of a beige color.  But it's

17  the same -- same type of terry material that I -- you

18  know, that we've all seen in hotels and bathrooms

19  everywhere in the country.

20     Q.     So it was an assumption?  The thickness of it

21  was just an assumption that you made?

22     A.     Yeah, an assumption that was later verified

23  once I received the sample of the towel.

24     Q.     Now, looking at the ASTM standard that you

25  cited to, the 1637 standard --

1  number -- this is the A1264.2 standard.

2      A.    Uh-huh.  Yes.

3      Q.    In paragraph 2.3, it says, "This standard is

4  intended to apply primarily to the protection of

5  employees in workplace situations.  It does not apply to

6  construction, residential occupancies, floating roof

7  tanks or marine dock facilities."

8          Would you agree, then, that the situation that

9  we're talking about in this case is outside the scope of

10 this standard?

11     A.    No.

12     Q.    On what basis would you -- would you say that

13 the standard applies even though it specifically says

14 that it does not apply?

15     A.    It doesn't specifically say it doesn't apply.

16 It says "primarily."  Right?

17     Q.    Okay.

18     A.    "Primarily" doesn't mean specifically, number

19 one.

20          Number two, this particular location, being a

21 bathroom of a hotel, for all practical purposes, would

22 be used by employees.  Right.  Somebody -- some

23 housekeeper, a worker is going to be coming into this

24 bathroom.  Right.  It's a work area for them.  They're

25 cleaning it.

1      I further certify that I am neither counsel for,

2   related to, nor employed by any of the parties or

3   attorneys in the action in which this proceeding was

4   taken, and further that I am not financially or

5   otherwise interested in the outcome of the action.

6      Certified to by me this 5th day of June, 2017.

7

8

9   _____
    ANGELA L. MANCUSO, CSR 4514
10   Expiration Date: 12/31/17
    Stryker Reporting Services
11   Firm Registration No. 806
    1452 Hughes Road, Suite 200
12   Grapevine, Texas 76051
    (817) 494-0700 Phone
13   (817) 494-0778 Fax

14

15

16

17

18

19

20

21

22

23

24

25